**WOLFE, Plaintiff, v. WOLFE, Defendant.**

Common Pleas Court, Lucas County.

No. 94280. Decided December 24, 1954.

Lane, Downing & DeMuth, Toledo, for the plaintiff's administratrix.

Fuller, Harrington, Seney & Henry, William Kreutz, Toledo, for defendant.

## OPINION

By ALEXANDER, J.

On motion of Virginia Arlene Wolfe, Administratrix of the Estate of Dwight L. Wolfe, Deceased, to modify decree for installment alimony by cancelling unpaid installments as of date of defendant-wife's remarriage.

The principal facts are as follows:

1925, May 7—Defendant-wife in this court was granted a divorce from plaintiff-husband, the decree awarding her: Custody of the two minor children; Alimony, to-wit, certain personal property; Further, "alimony in money, the sum of Ten Dollars ($10.00). payable upon the first day of each and every week through the Toledo Humane Society until further order of Court."

1926, Aug. 10—Defendant-wife remarried and is living with her second husband.

1940, Feb. 16—The younger child entered military service.

1942, Feb. 26—The elder child reached her majority.

1943, May 8—Plaintiff-husband made his last payment; total, $6,979.00.

1944, Sept. 16—The younger child reached his majority.

1951, Sept. 20—Plaintiff-husband died, a resident of Detroit, Wayne County, Michigan, where his estate is currently being administered.

In due course defendant-wife filed claim against plaintiff-husband's Administratrix for $7,351.00 installment alimony due and unpaid at decedent's death. The Probate Court of Wayne County, Michigan, has held the claim in abeyance to permit this Court to determine the motion now before it.

This motion appears to present the following **quaere**:

1. Has this Court legal power to cancel due and unpaid alimony installments?

2. If so, may it exercise its discretion so as to do equity?

Counsel for the Administratrix of plaintiff-husband argues that his legal liability terminated as a matter of law upon his wife's remarriage; that the so-called alimony was intended, and in fact was ordered for the support of the minor children, and as a matter of equity, the installments should be so treated and should be limited to the period of the children's minority.

Counsel for the defendant-wife contends that this Court is utterly without power to modify the order retroactively and relies upon a strict interpretation of the doctrine that due and unpaid installments are judgments, and may never be modified retroactively without a specific reservation of power to do so; and that as this motion is incident to a divorce case, this Court is shorn of equity power and jurisdiction.

The rule against retroactive modification of alimony installments goes back at least to 1896 (Craig v. Craig, 163 Ill. 176; 45 N. E. 153). It was given considerable impetus by the U. S. Supreme Court in Sistare v. Sistare, 218 U. S. 1 (1910): "Generally speaking, where a decree is rendered for alimony and is made payable in future installments the right to such installments becomes absolute and vested upon becoming due * * *." The rule has long been recognized in Ohio, perhaps the leading pronouncement by the Supreme Court being found in **Armstrong v. Armstrong, 117 Oh St 558 (1927).** We have been cited to a number of other Ohio cases: **Lockwood v. Krum, 34 Oh St 1 (1878); Gilbert v. Gilbert, 83 Oh St 265 (1911); Baker v. Baker, 4 Oh Ap 170** (Hamilton County, 1915); **Meister v. Day, 20 Oh Ap 224** (Lucas County, 1925); **Pace v. Pace, 41 Oh Ap 135** (Morrow County, 1931); **Aukland v. Aukland, 17 O. O. 387** (Franklin County, 1939); **In Re: Riggle, 18 O. O. 179** (Tuscarawas County, 1940); **Speer v. Speer, 36 O. O. 450** (Lucas County nisi prius, 1947); **McPherson v. McPherson, 153 Oh St 82 (1950); DeCamp v. Beard, 94 Oh Ap 367** (Hancock County, 1953).

In most of these cases the doctrine is recognized and supported, for the most part quite strictly; but in only one, the Baker case, is there presented a casus modificiendi similar to the one in the case at bar. And all but one were decided prior to the 1951 statutory amendment whereby the divorce courts of Ohio were restored to competency, at least as to equity jurisdiction.

Now, while the doctrine under discussion is unquestionably sound and salutary, a rigid and inflexible application appears dangerously susceptible to a **reductio ad absurdum.** While a majority of the states follow it there is none the less a split of authority and a state of confusion was recognized as existing in 1927 and was mentioned in the Armstrong case (supra). That some uncertainty still exists is indicated by the fact that the last two cases on the general subject before the U. S. Supreme Court were each decided by a divided court. (See Barber v. Barber, 323 U. S. 77 [1944]—not to be confused with the Barber case referred to in the Armstrong case, supra—and Griffin v. Griffin, 327 U. S. 220 [1946].)

And there is a feeling in some quarters that to hold the order for installment payments utterly unalterable once they have accrued, works needless injustice in enough cases to warrant reasonable relaxation of the rule in certain clear-cut instances. Perhaps this accounts for some of the confusion and uncertainty and for the frequency with which the bar initiates litigation in apparent defiance of the rule or else in the hope the court may not know about it, or knowing about it, may soften it.

In an unreported case which went up from this Court in 1938, we were considering a motion for a lump sum judgment for due and unpaid installments of child-support and, because we took literally and strictly the doctrine of "no retroactive modification," we made the mistake of rejecting the defendant-father's offer to explain the reasons he had become delinquent. But the Court of Appeals quickly set us straight on that point (Ramberg v. Ramberg, 46 Lucas Co. App. Opin. 311, at p. 316):

"However, in alimony cases where lump sum judgments are sought, the delinquent is given an opportunity to defend and to show, if he can, justifiable reasons which may cause the Court, in the exercise of a sound discretion, to make such lump sum judgment a less sum than the record may show to be due, less than the complainant claims, or perhaps refuse any such judgment."

So we mended our ways and began heeding "defenses." In 1943, in **In Re Shipley, 26 O. O. 217** (affirmed without opinion December 2, 1943, Lucas C. A. 3990), a mother sought lump sum judgment for $6,320 covering due and unpaid installments of child-support. In defense it was urged she had been guilty of laches in allowing the installments to accumulate for 11 years before attempting to collect; and that for nearly 10 years her new husband had enjoyed without let or hindrance by the natural father what amounted to a **de facto** adoption of the children as completely as if they had been legally adopted, and consequently it would be inequitable to compel the natural father to pay for privileges enjoyed exclusively by the stepfather. Following a decision of the New York Court of Appeals in an almost identical case, we allowed the defenses and modified retroactively by cancelling all installments accrued subsequent to the mother's remarriage.

In 1947 in the Speer case, supra (relied upon by both counsel—how equivocal of us!) we again followed the dictates of the Ramberg case, supra, but finding there a very limited defense, we made only a limited retroactive modification. But, as defendant-wife in case at bar has herself reminded us in her brief, we there opined that had the child for whom support was decreed died or married or become emancipated, such a defense would have been valid.

It is true that in the Armstrong case the money was to be "for alimony and maintenance of said children" and that one child entered military service and died in 1918, and one reached majority in 1917, the year the father stopped paying. But in that case the Ohio court was considering the issue not of voluntary enforcement of the Kentucky order, but whether full faith and credit must be given to it. The home court had post-decretal power, by statute, to "reverse and amend" the order. This power was reserved to the home court. Nothing appears in the statute empowering any foreign court to modify in any respect. The Ohio court can hardly be criticized for declining to view the order as one for child-support exclusively and consequently as terminated or at least terminable as of the date of emancipation, death or attaining majority of the children. Such a determination could have been assumed to be peculiarly within the province of the originating court which had continuing jurisdiction. Just the year before (1926) the Supreme Court of Alabama had rendered a decision to that effect in McAlister v. McAlister, 214 Ala. 345, 107 So. 843. See also cases cited in note at 132 A. L. R. 1272. Had the installments been ordered just for the support of children, and not as alimony, can it be seriously contended that our Supreme Court would have enforced them and thus required the father to pay child-support for a son who was no

longer living or a daughter who was no longer a child? Yet such is the absurdity to which the rule would be reduced by a strict and literal interpretation.

Unlike alimony, child-support is not ordered paid directly to the beneficiary, the child, but (usually) to the mother to spend for the child's benefit or, as it must turn out from time to time, to reimburse her for money she has already spent to maintain the child. When a child marries, enters military service, becomes emancipated, or reaches majority, the requirement of parental economic support is supposed by every dictate of Anglo-American culture, custom and common law to terminate. The parent is no longer held responsible for the child's maintenance. A son is then expected to support himself and when married, his own new family. A daughter is then expected to support herself or, when married, be supported by her new husband.

Then why does not a decretal obligation laid upon a divorced father to pay child-support terminate upon the occurrence of such an event, as automatically as it must upon the occurrence of the child's death? Despite the frequency with which we are besought to the contrary, we still believe it does, for the basic reason that the factual situation in contemplation of which the order was founded has ceased to exist. And the termination of the legal obligation must be held to take place at the time the event occurs and not when the court's attention is called to it so the order may be cancelled of record. Factually, in a tremendous majority of cases the court is never notified, and countless thousands of these installment orders still stand on the books with nothing to indicate they are either terminated or satisfied. The parties take for granted the obligation has been automatically ended. Why shouldn't the court?

And why doesn't the same logic apply when the factual situation in contemplation of which an alimony order was founded ceases to exist? Despite the urgency with which we are besought by the defendant-wife in the case at bar, we believe it does. We believe plaintiff-husband's decretal obligation to pay alimony to his former wife terminated automatically upon her remarriage. At that moment the factual situation in contemplation of which the order was founded ceased to exist, and new facts establishing a new status, and engendering new moral, ethical and legal obligations came into being.

Now, while there are material distinctions between the two, it must be remembered that alimony, like child-support, contemplates not the past but the future. It looks not backward but forward. Its raison d'etre is to make provision for the future. It is neither reward for virtue nor retribution for vice. It is nourishment, sustenance, support-money for the wife in the future. It is not payment of an ordinary debt, settlement of an unliquidated claim, an award of damages either ex contractu or ex delicto, restitution of property, or a distribution of assets as upon dissolution of a partnership. Of course, these are all matters which the court, upon granting a divorce, has both the right and the duty to determine

and finally adjudicate as justice and the equities of the case may require; and these ends are principally accomplished by a process generally referred to as division of property.

If, as so frequently happens, the property is not literally divisible, the desired equitable result is often obtained by rendering a money judgment in favor of one party to compensate for a deficiency in the amount or value of the property awarded to her or him; or, if there be no property to award, to settle and finally adjust economic and money claims between the parties. In order to face realities, soften the blow, and help insure ultimate collection of the judgment, it is often made payable in installments. But unless jurisdiction to modify such installments, future or past, be specifically reserved, it would seem such a judgment could and should under no circumstances be subject to any modification or attack other than for fraud, etc., as provided by **§2325.01 R. C. (§11631 GC).**

We have always found the transcendental profundities of the late Gertrude Stein too recondite for our minuscule comprehension, but in one of her less obscure observations we thought we detected a glimmer of its esoteric meaning: "A rose is a rose is a rose." This is still profoundly true, even though we call it a lily or a skunk-cabbage. Had Miss Stein been of a legal turn of mind she might have said: "Alimony is alimony is alimony," and it would have been equally true, whether we call it child-support, division of property, or an unmitigated racket. And conversely the same is true of child-support and specific money-judgments—whatever we may call them—in favor of a spouse against her mate.

When two people intermarry the husband's primary obligation to support the wife is imposed by contract, common law and statute. When they divorce, this obligation may be continued by the Court and if it be, the amount is determined and entered in the decree. And even though continuing jurisdiction be specifically reserved, as in case at bar, the order is none the less fixed and final until there occurs a substantial change in the circumstances of the parties or either of them.

If in case at bar we are to take the decree at its face value and construe "alimony" as meaning alimony, as defendant-wife insists we must, we must presume that it was awarded to her in contemplation of the future, that she was at the point of losing her status as a **feme covert** with its consequent right to support by the husband and of entering the status of a **feme sole** with no attendant right to support; that presumably during coverture she was supported by her husband and that if this support were wholly and immediately withdrawn she would suffer unjustifiably, the husband would be unjustifiably relieved of his obligation, and the state might unjustifiably have to assume that obligation.

So long as this situation obtained the alimony order must be presumed to have been proper as well as valid. But when defendant-wife remarried and again became a **feme covert,** she gained with her new status the right by contract, by common law and by statute to be supported by her new husband. For a wife to be supported by a new husband with whom she is

presumably living and at the same time by a former husband with whom she is presumably no longer living and from whom she is divorced, has shocked the sensibilities of at least one Ohio court (Baker v. Baker, supra):

"Alimony is an allowance made to a woman upon a decree of divorce given her for her support out of the estate of her husband. This plaintiff now has another husband and is, presumably, happily living with him. While her remarriage is entirely proper and may be regarded as highly commendable, she must have understood upon re-entering the matrimonial state that such a step would make any further support, voluntary or involuntary, from her former husband inconsistent and incompatible with accepted notions respecting one of our most sacred institutions, and that therefore the decree in her favor against him might be affected by her new relations."

To hold that a wife is entitled to be supported by both husbands contemporaneously is repellent even to modern and ultra-liberal moral and ethical concepts; it violates one's sense of justice to the first husband, for one can imagine few things more unfair than being compelled to contribute to the support of another man's— possibly a successful rival's-wife. (This is not to say it is unfair to require him to pay her what he owes her.) It is unsalutary for the wife in that it must encourage parasitism and may tend to diminish her loyalty to the new husband. It would tend to demoralize the second husband by impairing his ego and making the first husband a constant threat to the security of his position. It is repugnant to the traditional attitude of the law favoring the preservation of marriages in that it would in many cases serve as the introduction of a wedge of dissension to split the second marriage. Also, it would tend to encourage plural marriages. It is against public policy in that it would not only condone but would legalize one type of alimony racket: it would be tantamount to a court broadcasting that it would protect a woman's right to collect support from as many husbands as she could collect!

Outside Ohio, the weight of authority has seemed to point in the other direction; but, without counting noses, we have gained the impression that the more recent cases adopt the view of the Baker case, supra. New York once held that the wife's remarriage could not affect the alimony order but now has a statute (Sec. 1159 Civil Practice Act) compelling the judge to cancel the order upon showing of the wife's remarriage and the Court of Appeals has held (Kirkbride v. Van Note, 275 N. Y., 244, 9 N. E. 2d, 852, 112 A. L. R., 243) that the annulment of such provision is not personal to the husband and after his death it may be exercised by his personal representative. In California it was held in Atlass v. Atlass, 112 Cal. App., 514, 297 P. 53 (1931) that an order annuling the provisions of a decree of alimony, the wife having remarried, by providing that payments cease as of the date of the order rather than as of the date of the remarriage, was erroneous. In Connecticut the Supreme Court has said, in Cary v. Cary, 112 Conn., 256, 152 A., 302 (1930):

"The better rule which we adopt, save in the most exceptional cir-

cumstances, draws from the voluntary action of the wife in remarrying the inference that she has elected to obtain her support from her second husband and has thereby abandoned the provision made for her support by the court in its award of alimony."

This Court is not quite ready to go as far as the majority even though to avoid doing so we must modify retroactively accrued alimony installments. We respect the general rule against such modification. Some of the reasons supporting it are set forth in a recent case note in the current University of Chicago Law Review, Vol. 22, No. 1 at page 247. We are in accord with most of them, and from our divorce court experience might add one or two. The note also mentions some instances in which the retroactive power could be exercised to relieve hardship. But it does not mention the one that seems to us most cogent of all, the divorced wife's remarriage. Nor does it discuss situations where the power might properly be exercised to **increase** retroactively past due installments. But it does say:

"The rule permitting retroactive modification seems more apt to achieve substantial justice, provided that the power is exercised only after careful consideration of the wife's circumstances."

This comes pretty close to stating our own thesis, although we are inclined to put scrutiny of the children's circumstances first and would hesitate wholly to exclude the ex-husband. In other words, a court confronted with an application to modify an order for installment alimony or child-support, future or past due, must look at the whole picture, past, present and as far into the future as possible, and exercise its discretion to do equity, bearing in mind that it may deviate from general rules of law only for most compelling reasons.

This brings us to our second quaere: Have we power to exercise discretion so as to do equity? This idea of the governance of equity in cases like this is far from novel despite the vigor with which defendant-wife attacks it in the case before us. To cite a few instances at random:

Nearly a hundred years ago (in 1858) the Supreme Court of the United States, speaking of interstate enforcement of judgments for divorce and alimony, said:

"For such a purpose, both the **equity courts** of the United States and the same courts of the States have jurisdiction." (Barber v. Barber, 21 How. U. S. 582. Italics ours.)

This case was mentioned by our Supreme Court in the Armstrong case, supra. In another U. S. Supreme Court case mentioned in the same opinion we find:

"The provision of the payment for alimony in the future was subject to the discretion of the **Court of Chancery** of New Jersey * * *." (Lynde v. Lynde, 181 U. S. 183, 1901. Italics ours.)

In a more recent case, the Supreme Court of Maryland holds:

"To deny a **court of chancery** (the power to cancel or reduce arrears) prevents the rectification of an obligation which would not have been

created had the chancellor been able to anticipate the later faculties of the husband, and defeats the rule that the maintenance afforded the separated wife through alimony is not to be greater than what she would have enjoyed in cohabitation." (Winkel v. Winkel, 178 Md., 489, 500; 15 A. 2d, 914, 919, 1940. Italics ours.)

That brilliant master of equity, Prof. Zechariah Chafee, of the Harvard Law School faculty, in his latest book on the subject, **Some Problems in Equity** (U. of Michigan Law School, 1950), has a delicious chapter on equity in matrimonial cases. He cites several instances showing the folly of a rigid application of certain rules (notably the "clean hands" doctrine) in divorce and annulment cases and comments:

"At the same time, domestic problems ought not to be subjected to inflexible rule." (p. 79.) And: "Of course judges ought to have some discretion about denying a divorce when the petitioner is unfaithful, but discretion means the ability to use a practical judgment in shaping the decision so as to fit the facts and the needs of the particular situation." (p. 84.)

In times past when an Ohio court had need to exercise equity jurisdiction in a divorce case it was confronted with holdings that as divorce is a purely statutory proceeding the court could do only those things provided by statute. However correct and historically well founded these decisions were, their effect often was to hamstring the court handling a divorce case and hamper it in trying to "shape the decision so as to fit the facts and the needs of the particular situation."

So a few years ago a movement was started to alleviate this situation by statute. The common pleas court is a court of general legal jurisdiction and at the same time a court of equity. It possesses all the equity jurisdiction there is. Why must it be shorn of its right to exercise its own equity jurisdiction just because it is hearing a divorce case? The legislature was asked to enact a statute not to add to its equity jurisdiction but to provide against its being deprived thereof when hearing a domestic relations case. And in 1951 just such a statute was enacted: the last sentence of **§3105.20 R. C. (§8003-21 GC)**: "In any matter concerning domestic relations, the court shall not be deemed to be deprived of its full equity powers and jurisdiction." The hands of the court were at last untied!

Equity came into being to provide remedies where there was no adequate remedy at law; to permit defenses to mitigate the sometimes harsh results of an inflexible application of rigid rules of law

The rule against retroactive modification is not changed. But where strict enforcement would be unconscionable, immoral and against public policy—in such a case the court now clearly has both the right and the duty to exercise its equitable jurisdiction. And we believe case at bar to be such a case.

But equity is no respecter of persons, and it may cut both ways. Although we hold the plaintiff-husband's obligation to pay **alimony** terminated upon defendant-wife's remarriage, we do not find that that occurrence terminated his entire obligation to her.

Since we are by statute restored to our full equity powers and jurisdiction, this case seems to present a peculiarly appropriate occasion for the application of another equitable principle, "Equity looks to the substance, not to the form—perhaps for a new style in equitable conversion: "alimony" into child-support! We find the following facts significant:

1. Although the divorce decree awarded custody of the children and provided for their visitation, it made no articulate provision for their support.

2. In 1925 $10 weekly was the amount this court commonly ordered for the support of two children.

3. The "alimony" was made payable through the Toledo Humane Society which has always collected and disbursed child-support but has refused to handle alimony alone.

4. For 17 years following the mother's remarriage, the father paid with imperfect regularity.

5. At a point almost exactly midway between the dates of the coming of age of his two children, the father stopped paying altogether. (Overpayment on the elder child offsets underpayment on the younger.)

6. There is no evidence that the wife complained upon his stopping payment at that time.

These facts seem to us to indicate that the $10 weekly payments were regarded as, were intended to, and actually did constitute child-support as well as alimony. This view is concurred in by the Administratrix of the father's estate although, because of accumulated delinquencies, it must cost the estate substantially more than if it were held to be alimony only, and hence terminated upon defendant-wife's remarriage.

This court is accordingly placing this construction upon its own earlier judgment. We find that in equity plaintiff-husband should have paid $10 each week up to the very time he quit, regardless of the remarriage of the mother. We are not called upon to make any apportionment of the payments as between alimony and child-support, but in any event $10 per week applied wholly to child-support would appear far from excessive, even for one child. It does not appear that the parties regarded the boy's entering military service as emancipating him. For over three years thereafter the father continued paying, during the last half of that period at the rate of $30 per month.

Altogether plaintiff-husband paid, during the period of 939 weeks, a total of $6,979.00. At $10 per week this leaves a deficiency of $2,411.00. for which amount, with interest from May 8, 1943, judgment is hereby rendered in favor of defendant-wife against the Administratrix; and the original order of May 7, 1925 is modified in accordance herewith.

A journal entry may be prepared accordingly, allowing exceptions to both parties.